## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Jerry Marsh,

           Debtor.

Chapter 7
Bankruptcy Case No. 16-32704

Madison Resource Funding Corp.,

           Plaintiff,

v.

Jerry Marsh,

           Defendant.

Adversary Proceeding No. 16-03127

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

At Saint Paul, Minnesota.

This adversary proceeding was commenced November 18, 2016 by Plaintiff Madison Resource Funding Corp. ("Madison") against Defendant Jerry Marsh. Dkt. No. 1. Madison sought a determination that a debt owed to Madison in the amount of $1,697,213.50 plus attorney's fees and interest is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Dkt. Nos. 1; 42; 121-22. Madison alleged Jerry Marsh made misrepresentations and omitted material facts concerning the relationship between Synico Staffing, LLC ("Synico") and Syglo, LLC ("Syglo") when he executed a Madison Resource Funding Agreement ("Master Agreement") and an Accounts Receivable Security Agreement ("Security Agreement") in favor of Madison and when he later indicated that Syglo had been contracting with certain companies to provide staffing services.

The case was assigned to this Court on December 20, 2019. The case proceeded to trial on Count I of the Amended Complaint on February 25-26, 2020. Dkt. Nos. 42; 123. Counts II, III,

1

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *09/30/2020*
Lori Vosejpka, Clerk, by WM

and IV of the Amended Complaint were dismissed by stipulation of the parties. Dkt. No. 123. Paul Ratelle and Alexander Conti appeared for the Plaintiff; Matthew Fling appeared for the Defendant. The Court heard testimony of the following witnesses: Melody Smith; Amanda Naples; Mary (Molly) McQuillen; Robert Gilbert, Jr.; John Carney; Richard Chipman; and Jerry Marsh, and admitted the following exhibits: 1-13; 15-28; 31-33; 38-42; 45-54; 56; 58; 60-61; 63-72; 74-81; 83-86; 89-94; 97-110 (101 as amended); 112-14; 117; 136; 146; 148; 150-58; and the deposition of Mark Anthony Sawicki. The Court also admitted facts 1 through 9 listed on Madison's request for "judicial notice" after no objection was made to the request. Dkt. No. 124.

Following the admission of evidence in this adversary proceeding, the Court heard the trial of <u>Madison Resource Funding Corp. v. Robert Marsh</u>, Adv. No. 18-04198 on February 26-27, 2020. All evidence admitted in this adversary proceeding was admitted in <u>Madison Resource Funding Corp. v. Robert Marsh</u>, but the evidence heard and admitted in <u>Madison Resource Funding Corp. v. Robert Marsh</u> was not admitted in this adversary proceeding. Closing arguments for both cases followed the close of evidence in <u>Madison Resource Funding Corp. v. Robert Marsh</u> on February 27, 2020.

The Court denied the Defendant's motion to dismiss brought at the conclusion of Madison's case. The Court took Madison's motion in limine and the merits of the case under advisement following the conclusion of the closing arguments on February 27, 2020. Post-trial submissions were made in <u>Madison Resource Funding Corp. v. Robert Marsh</u> on March 6, 2020 and March 20, 2020 but these submissions were limited to <u>Madison Resource Funding Corp. v. Robert Marsh</u> and do not apply to this adversary proceeding. The parties agreed to continue mediation in both Marsh cases on May 26, 2020, and the mediator requested that no action be taken by the Court during the

mediation. An impasse was reported on September 30, 2020. The Court makes the following findings of fact and conclusions of law and holds the debt owed to Madison is not dischargeable.

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, Fed. R. Bankr. P. 7001, and Local Rule 1070-1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Findings Of Fact

**Background Of Robert Marsh, Jerry Marsh And Synico**

1.     Robert Marsh and Jerry Marsh are brothers. Stipulation of Facts ("Stip."), Dkt. No. 117 ¶ 1.

2.     From 1996 to 2005, Robert Marsh and Jerry Marsh worked together at a staffing agency called HCP, Inc. Robert Marsh owned HCP, Inc. and Jerry Marsh was the operations manager. HCP, Inc. filed for bankruptcy in 2005 and is no longer in existence. Stip. ¶ 2; ex. 3.

3.     In 2006, Synico was formed. Synico was a temporary staffing agency which operated to fulfill the temporary staffing needs of other companies. Robert Marsh was employed as the president of Synico and Jerry Marsh was employed as the vice president of Synico. Stip. ¶ 3; ex. 3.

4.     Jerry Marsh signed Synico's articles of incorporation. Ex. 117. Jerry Marsh was listed as a member and vice president of Synico, but there is no evidence he held ownership shares in the company. Exs. 3; 38-39; 117. To the extent Madison argued Jerry Marsh held an ownership interest in Synico, Madison failed to meet its burden of proving that

3

Jerry Marsh held shares of the company. Jerry Marsh's denial of ownership of shares in Synico was credible. Jerry Marsh had signatory authority on Synico's accounts but denied having control of financial aspects of Synico, which he testified was Robert Marsh's role at the company. Ex. 40.

**The U.S. Bank/Bartech Contract With Synico**

5.      In January 2012, Synico and U.S. Bank had a direct relationship and contract for Synico to provide U.S. Bank with temporary staff. Stip. ¶ 4.

6.      In February 2012, Synico signed a loan agreement and line of credit agreement with Summit Community Bank for a $2,364,000.00 loan and $200,000.00 revolving line of credit. Stip. ¶ 5. Both the loan and line of credit were secured by all of Synico's assets. Stip. ¶ 5.

7.      Later in 2012, U.S. Bank changed its temporary staffing business practices and contracted with The Bartech Group, Inc. ("Bartech") to facilitate all of U.S. Bank's temporary staffing requirements. Bartech acted as what is known in the staffing industry as a managed service provider. As a result, Synico no longer had a direct relationship and direct contract with U.S. Bank and had to go through Bartech to supply temporary staff to U.S. Bank. Stip. ¶ 6.

8.      In January 2013, Synico and Bartech entered into a services agreement whereby Synico would supply U.S. Bank with temporary staff through Bartech. Stip. ¶ 7; ex. 41; 42. The agreement required Synico to inform Bartech of its intent to use a subcontractor to perform under the contract. It also required Synico to notify the "Customer" in advance of any changes to its use of a subvendor. Ex. 41 ¶ 10.1. Further, the agreement required the use of any subvendor to be "approved in writing by Customer." Ex. 42 ¶ 10. Robert

4

Marsh was the signatory on these agreements, but listed Jerry Marsh, as vice president of Synico, as a point of contact for any notices. Ex. 42 ¶ 12.

**Jerry Marsh Creates Syglo**

9.      In July 2013, Jerry Marsh formed Syglo, originally named McFarland Staffing Group, LLC. Syglo was a temporary staffing agency. Jerry Marsh was the sole owner and employee of Syglo. Stip. ¶ 8; ex. 45. Jerry Marsh testified that Syglo differed from Synico in that Syglo provided temporary staff to smaller and more industrial clients, but, otherwise, there was no real differences in how the businesses operated.

10.     Jerry Marsh testified he made the decision to start Syglo in 2013 because he was not an owner of Synico and wanted to own a staffing agency. He considered himself an officer but not an owner of Synico.

11.     In January 2014, he signed an account agreement at Anchor Bank for Syglo and listed Synico as his employer. Ex. 52. Synico continued to be listed as Jerry Marsh's employer on other account agreements at Anchor Bank in 2014 and 2015. Exs. 53; 54. Jerry Marsh testified that he owned Syglo but still worked for Synico as he was in the process of "getting Syglo off the ground." Exs. 64-65; 67-69; 77.

12.     Jerry Marsh continued to provide workers' compensation and insurance audit services to Synico. Exs. 58; 61; 63-65; 77; 79-80. He testified he continued to work at Synico in a limited role under an "administrative agreement" and emails support that Jerry Marsh continued to oversee aspects of Synico from 2014 through 2016. Exs. 80-81; 83-86; 89; 94. On at least one occasion, Jerry Marsh referred to Syglo as "our other company" when discussing tax extensions for Synico. Ex. 90.

13.     Syglo had the same address as Synico. Ex. 45. Jerry Marsh testified he used a virtual

office space to conduct business, but he still used the physical office he had at Synico

as he still worked at Synico primarily on workers' compensation issues. Jerry Marsh

testified he used the office at Synico because it was vacant and he had a key to Synico.

Synico had a virtual office space that it assigned to Syglo in January 2014. Ex. 47. Jerry

Marsh testified that most staffing agencies are no longer brick and mortar businesses

because they can conduct most communications electronically.

14.     The website for Syglo was registered under Synico's account and the domain-hosting

fees appears to have been billed to Synico. Exs. 49-50.

15.     The only equipment Syglo owned was Jerry Marsh's laptop. Jerry Marsh used the same

phone number for Syglo that he used at Synico and Synico paid for the phone. Ex. 46.

Jerry Marsh testified that he used his Synico cell phone as his Syglo phone because he

had just left his job at Synico when he started Syglo.

16.     Jerry Marsh testified that he maintained an email address with Synico and had an email

address with Syglo. He used his Synico email address to conduct business in 2015 and

2016 and continued to identify himself as a vice president of Synico in the signature

block of his email. Exs. 64-65; 67-69.

**Synico and Syglo Enter Into A Subvendor Contract Concerning U.S. Bank/Bartech**

17.     Jerry Marsh sought Robert Marsh's advice and aid when he created Syglo and involved

Robert Marsh in income discussions regarding Syglo. Test. of Jerry Marsh. Jerry Marsh

testified that he told Robert Marsh he wanted to expand his business and knew U.S.

Bank had been a long-term customer of Synico. After this conversation, Syglo began

providing temporary staff to U.S. Bank/Bartech. Test. of Jerry Marsh.

6

18. On June 6, 2014, Synico and Syglo entered into a subvendor services agreement whereby Syglo would provide temporary staff to U.S. Bank as a subvendor to Synico. Stip. ¶ 9; ex. 32. The subvendor agreement required Synico to pay Syglo for services rendered as those services were approved by U.S. Bank/Bartech. The agreement also provided that Synico was not required to pay Syglo if U.S. Bank/Bartech failed to pay Synico. Ex. 32 § 2.4. Syglo agreed to invoice Synico on a weekly basis. Ex. 32 § 2.2.

19. A representative of Synico did not give written notice to Bartech about the existence of a subvendor relationship between Synico and Syglo to provide workers to U.S. Bank. Sawicki Dep. at 11-12. Syglo was not an approved subvendor to Synico authorized by Bartech to provide staff to U.S. Bank. Sawicki Dep. at 12. Such a relationship would have to be approved by Bartech in writing. Sawicki Dep. at 11-12. Jerry Marsh testified that there was a verbal agreement between Synico and Bartech to use subcontractors. The Court does not find Jerry Marsh credible regarding this portion of his testimony and finds Bartech was not aware of the subvendor agreement between Synico and Syglo.

20. U.S. Bank was Synico's largest customer in 2015 and 2016. Test. of Jerry Marsh. The temporary employees supplied to U.S. Bank were trained to provide their hours worked to Bartech and, therefore, Syglo and Synico did not need to send an invoice to Bartech or U.S. Bank for the hours worked by the employees during each pay period. Test. of Jerry Marsh. Bartech had 21 days to pay under the services agreement between Bartech and Synico. Ex. 42.

### Background of Madison

21.   Madison provides payroll and billing services to temporary staffing agencies and buys
existing and future accounts of those companies. Stip. ¶ 10; ex. 6 ¶ 3. By providing
payroll services and funding to staffing agencies, Madison enables the temporary
employees of those staffing agencies to be paid on a timely basis before the company
to which the staffing services were provided issues payment. Test. of Melody Smith;
test. of Robert Gilbert.

22.   Richard Chipman, the vice president and chief financial officer of Madison, testified
that he oversees all day-to-day operations of Madison, and exclusively oversees all
temporary staffing customers of Madison. Richard Chipman testified that Madison
receives a small fee for providing payroll services and maintains relatively low profit
margins of approximately 10% of a 4% fee charged on the payroll advances.

23.   Richard Chipman testified that Madison receives a Dun and Bradstreet report on any
potential customers of Madison and their clients and will conduct other investigations
into the businesses' creditworthiness. Richard Chipman testified he has final approval
of customers and the clients to whom Madison will provide payroll services. The
agreements between Madison and customers reserves Madison's right to refuse to
finance any clients of the customers. Test. of Richard Chipman; see ex. 6 ¶ 6.

24.   Madison only allows subvendor contracts on a very limited basis, particularly only
allowing large companies to subcontract. Test. of Richard Chipman. Richard Chipman
testified it is "absolutely critical" that Madison know about any subvendor relationships
and Madison will conduct the same due diligence on subcontractors as it would conduct
on a customer. Richard Chipman testified that it was important to perform due diligence

on any subcontractor clients because, in those cases, an intermediary business could interrupt accounts receivables and Madison's ability to be paid.

25.    Madison has frequently refused to allow small companies to subcontract. Test. of Richard Chipman. If a subvendor relationship exists with Madison's customers, the existence of this relationship is sent to Richard Chipman by Madison employees. Test. of Richard Chipman.

**Syglo And Madison Enter Into A Funding Agreement**

26.    On October 20, 2014, Melody Smith, a senior sales representative of Madison, left a voicemail for Robert Marsh at Synico about Madison's services, but had not spoken directly to Robert Marsh or Jerry Marsh. Test. of Melody Smith. On October 22, 2014, Jerry Marsh left Melody Smith a voicemail after getting her contact information from Synico. Exs. 1; 2. Melody Smith's responsibilities at Madison involved contacting prospective clients and facilitating the creation of a contractual relationship between the prospective client and Madison.

27.    In October 2014, Syglo was self-funded, but "Wells Fargo had a division that was processing [Syglo's] payroll." Test. of Melody Smith. Jerry Marsh testified that he was initially reluctant to use Madison's services but ultimately agreed after speaking to Melody Smith several times. Melody Smith recalled that Jerry Marsh was very interested in setting up financing immediately and her account notes reflect that Jerry Marsh immediately filled out application materials upon initiating contact with Melody Smith; ex. 1. Melody Smith testified credibly about the eagerness of Jerry Marsh to establish financing by Madison.

9

28.   Jerry Marsh provided his resume as part of the intake process with Madison. His resume
indicates he was employed at Synico from 2006 to 2014. Ex. 3. Melody Smith
interpreted this document to mean that Jerry Marsh no longer worked at Synico and she
did not recall Jerry Marsh referencing any connection or subvendor relationship
between Syglo and Synico in her early contacts with Jerry Marsh. Test. of Melody
Smith.

29.   Melody Smith testified that if Jerry Marsh told her he still worked for Synico or had as
subvendor relationship with Synico, she would have immediately communicated the
information to her superiors.

30.   Jerry Marsh testified that he told Melody Smith during their first conversation that he
had a subvendor relationship with Synico and she never requested further information
about the subvendor relationship. The Court does not find Jerry Marsh credible
regarding his communication of the subvendor contract to Madison during his initial
communications with Madison employees. The Court finds Melody Smith credible that
Jerry Marsh never informed her that Syglo had a subvendor relationship with Synico.

31.   Jerry Marsh testified that he was not aware that his continued work for Synico was
prohibited by Madison, and he did not recall Madison ever asking if he was still
employed by Synico.

32.   Prior to Madison agreeing to fund Syglo, Madison requested information on any
subvendor relationships of Syglo. Test. of Melody Smith. Syglo indicated in writing
that it was a subvendor for ManPower and Adecco, which are large companies in the
staffing industry, but Syglo did not provide any information concerning a subvendor
relationship with Synico. Ex. 4. Jerry Marsh also provided information on Syglo's

clients as part of Madison's determination of credit limits that Madison would provide. Exs. 4-5.

33.    On November 6, 2014, Madison and Syglo entered into the Master Agreement which had a two-year term. Stip. ¶ 10; ex. 6. Jerry Marsh signed the Master Agreement on behalf of Syglo. Stip. ¶ 10; ex. 6.

34.    The Master Agreement provides that Madison can "reject, in its sole and absolute discretion, any Customer for funding or servicing for whatever reason at any time . . . ." Ex. 6 ¶ 6. The Master Agreement also provided, "The CLIENT agrees not to enter into any other contracts or agreements, which may affect or impair the employee rate structure or the right of MADISON to bill customers for services, without the express consent of MADISON." Ex. 6 ¶ 15. The agreement also provided that Syglo was not permitted to receive any payment on any invoice or take possession of any accounts receivable from a customer to which Madison provided funding. Ex. 6, Schedule D.

35.    Jerry Marsh testified that he knew he had to disclose subvendor contracts under the terms of the Master Agreement with Madison but believed he had adequately informed Madison of this information during their initial conversations.

36.    Melody Smith testified that Jerry Marsh was instructed not to accept any payments directly from his clients and if he communicated an intent to receive funds directly, this information would have been considered a "red flag."

37.    The Master Agreement provided that it would be a material breach of the agreement if Syglo deposited any funds received from a client into its account. Ex. 6, Schedule D.

38.    The Master Agreement required Syglo to sign a Security Agreement and Unlimited Guaranty. Jerry Marsh signed the Security Agreement on behalf of Syglo. Stip. ¶ 11;

ex. 7. The Security Agreement assigned all of Syglo's accounts receivable to Madison and provided that Syglo had no other claims to its accounts receivable. Ex. 7 ¶ 7. Jerry Marsh also signed the Unlimited Guaranty guaranteeing the obligations of Syglo to Madison. Stip. ¶ 12; ex. 8.

39.     On November 10, 2014, Madison recorded with the Minnesota Secretary of State a UCC Financing Statement whereby Syglo granted Madison a security interest in all of Syglo's property. Stip. ¶ 13; ex. 31.

**Madison Begins Funding Payroll For Syglo's Temporary Employees At U.S. Bank/Bartech**

40.     In March 2015, Jerry Marsh submitted U.S. Bank/Bartech as a new client in Madison's system. Exs. 10-11. Jerry Marsh did not indicate that it would be a subvendor to Synico for the client on the new client form, information which is generally included in the comments section of the form. See Ex. 11. Jerry Marsh had previously disclosed in writing ManPower and Adecco as entities to which Syglo would be a subvendor on other contracts. Ex. 4.

41.     Mary (Molly) McQuillen, a payroll specialist employed by Madison, testified that when a new client is added in Madison's system, Madison would decide whether to extend credit on the new account by checking the creditworthiness of the client. Test. of Molly McQuillen.

42.     Jerry Marsh testified he informed Madison verbally of the subvendor agreement with Synico. He also testified the subvendor agreement with Synico had been dormant in October and November of 2014 which is why it was not disclosed in writing when he disclosed the other subvendor relationships of Syglo. Ex. 4. If Madison was informed of a subvendor relationship with a client, Madison would perform a due diligence check

of the creditworthiness of the intermediary company in deciding whether it would provide funding to the new client. Test. of Richard Chipman.

43. Madison began funding and processing payroll for temporary staff supplied by Syglo to U.S. Bank/Bartech in March 2015. Stip. ¶ 14.

44. Madison used a "match and file" system to distribute payment to Syglo's temporary staff provided to U.S. Bank/Bartech. Ex. 15. This means that Syglo would enter the hours worked by temporary employees into Madison's online portal, Madison would generate a paybill that Syglo would approve or direct Madison to modify, and then Madison would issue payroll to the employees. Test. of Molly McQuillen; ex. 13. Payments then should be made from the customer of Syglo directly to Madison. Test. of Amanda Naples. If the payments to Madison did not adequately describe the invoice to which it applied, Madison would request the invoices Syglo sent to the customer for payment in order to match the payment received by Madison to the invoice. Test. of Amanda Naples; ex. 15. Madison would charge approximately 4% in fees for the amount advanced, and approximately 10% of that 4% fee would represent profit to Madison. Test. of Richard Chipman.

45. However, in this case, direct payments were not made from U.S. Bank/Bartech to Madison. Rather, U.S. Bank/Bartech would send payments to Synico, which would then send a portion of that payment to Syglo, which would then send payment to Madison. Exs. 103-08.

46. Amanda Naples, an accounts receivable collections specialist for Madison, testified that if she had been informed that Syglo received payments and then sent them to Madison, she would have informed her superiors because it would be a breach of

contract. Ex. 6, Schedule D ¶ 2.B. ("Unless specifically permitted by MADISON, CLIENT **shall not**: . . . Take possession of, receive or endorse any sum of or other consideration in payment of any invoice subject to this agreement . . . ." (emphasis in original)).

47.   Neither Amanda Naples nor Molly McQuillen recalled Jerry Marsh ever informing them that Synico had the direct relationship with U.S. Bank/Bartech and that Syglo was subvendor to Synico. Amanda Naples testified she believed the payments were made directly from U.S. Bank/Bartech.

48.   Email communications and invoices between Amanda Naples and Jerry Marsh and Molly McQuillen and Jerry Marsh do not mention a subvendor relationship with Synico. They give the appearance that U.S. Bank/Bartech is the direct customer of Syglo without any intermediary and that U.S. Bank/Bartech was paying Madison directly. Exs. 10; 11; 15-18; 22; 24-26.

49.   Amanda Naples, who was responsible for recovering accounts receivables and contacting Syglo to receive remittance information, testified that in all of her communications with Jerry Marsh regarding the creation of U.S. Bank/Bartech as a new client, payment communications, and invoice communications, Jerry Marsh never mentioned that Syglo was a subvendor to Synico on the U.S. Bank/Bartech contract. Nor did he correct Amanda Naples when she referred to payments from U.S. Bank or referred to U.S. Bank as the customer of Syglo rather than Synico. Exs. 17-26.

50.   Amanda Naples believed U.S Bank made the payments on invoices provided by Jerry Marsh to Madison, and Jerry Marsh never informed her Syglo was making the payments to Madison rather than U.S. Bank/Bartech. Exs. 20-26. In emails to Amanda

14

Naples, Jerry Marsh indicates that payments to Madison came "from US Bank" and that large companies, like U.S. Bank, tend to pay slowly. Exs. 22; 25.

51.    Representatives of Madison agreed that between November 2014 and May 2016 the parties had a satisfactory relationship and Madison profited from the relationship during that time. Test. of Melody Smith; test. of Molly McQuillen; test. of Richard Chipman.

**Synico and Syglo During Syglo's Agreement With Madison**

52.    Robert Gilbert Jr., who was employed as a controller at Synico from 2007 until 2016, testified his role involved handling accounts receivables, staff payments, and payroll for Synico. Robert Gilbert's testimony was tentative and he appeared confused at times. He reported directly to Robert Marsh.

53.    Robert Gilbert described Jerry Marsh's role at Synico as being in charge of customer service, benefits, and insurance.

54.    Robert Gilbert oversaw the transfer of a portion of Synico's employees to Syglo for Synico's U.S. Bank/Bartech customer. Exs. 66; 71-72; 74-75. When Robert Gilbert transferred employees to Syglo from Synico, he does not recall ever doing so against Robert Marsh's wishes. Some of the temporary employees employed by Synico at U.S. Bank/Bartech were transferred to Syglo, but Synico also retained some of its temporary workers at U.S. Bank/Bartech. Ex. 72. Robert Gilbert testified that when Syglo ultimately filed for bankruptcy in August 2016, Robert Marsh directed Robert Gilbert to transition a portion of Syglo's temporary employees to Synico. There was overlap in the temporary employees used by both companies as evidenced by Synico's transfer of employees. Exs. 66; 71-72; 74.

15

55. Synico and Syglo also had some overlap concerning insurance for employees. Ex. 98.

56. Once Syglo began providing temporary employee services to U.S. Bank/Bartech through Synico, Jerry Marsh was also involved in the movement of temporary employees from Synico to Syglo.

57. Robert Gilbert testified that Syglo was not paid directly by U.S. Bank. Syglo relied on Madison to pay Syglo's employees on a timely basis because a delay occurred between payments from U.S. Bank to Synico and then from Synico to Syglo. Robert Gilbert believed Syglo was created for the purpose of entering a factoring agreement to pay temporary employees and believed it was created at Robert Marsh's direction. But, Robert Gilbert had no knowledge on this fact, as he did not provide the foundation for his beliefs. It was just his assumption.

58. Synico used Wells Fargo Bank's payroll services division to process payroll of its staff and did not pursue a factoring agreement with Madison for financing payroll. Test. of Robert Gilbert.

59. In various emails, Robert Gilbert referred to Syglo as a company started by the Marsh brothers with the intent to pay the temporary U.S. Bank employees through Syglo. Exs. 60; 66; 70; 75. In one email to a friend, Robert Gilbert wrote, "Did you hear the Marsh Boys started a new company? It's called Syglo. It is supposed to be short for 'Synico Global.'" Ex. 60. While these emails provide insight into Robert Gilbert's beliefs, they provide no facts as to the intentions of Robert Marsh and Jerry Marsh regarding the relationship of the companies.

60.     Robert Gilbert testified that Jerry Marsh worked for Synico in 2015 and received

wages. In 2015, Synico paid Jerry Marsh approximately $18,000.00. Ex. 100. In an

email in 2015, Jerry Marsh identified himself as a vice president of Synico. Ex. 58.

61.     Robert Gilbert discussed a raise with Jerry Marsh for Robert Gilbert's role at Synico in

September 2015. Ex. 78. Jerry Marsh would also direct Robert Gilbert to take actions

on behalf of both Synico and Syglo. Exs. 56; 94. Robert Gilbert was tasked to complete

the 2014 tax return for Syglo by Robert Marsh. Ex. 92. At times, Robert Gilbert was

involved in sending checks or money regarding Syglo bills and Robert Marsh was

contacted regarding Syglo bills. Ex. 99.

62.     The temporary employees who worked at U.S. Bank under the agreement between

Synico and Bartech were not told if they were being paid by Synico or Syglo. Test. of

Robert Gilbert. (In fact, some were paid by Synico and some by Syglo. Ex. 72). The

temporary employees would record their worked hours on Bartech's program. Ex. 93.

Payments were then made from Bartech to Synico and Robert Marsh would transfer

money to Syglo. Exs. 103-08.

63.     These payments from Synico to Syglo were tracked in bank statements that indicate

large sums were regularly transferred from Synico to Syglo for the U.S. Bank/Bartech

contracts, and Syglo would then transfer a lesser amount to Madison. Ex. 136. Robert

Gilbert testified he believed Robert Marsh transferred the funds, but was unsure how

the amount was calculated.

64.     Robert Gilbert testified he did not communicate with Madison and did not recall being

told to keep the relationship between Synico and Syglo a secret.

17

65. Steve Lassiter, who was employed by Synico, maintained the financial records for Syglo and used QuickBooks software to do so. Test. of Jerry Marsh. In an email to Jerry Marsh, Steve Lassiter indicated that he treated Syglo as "a separate company from Synico" in QuickBooks. Ex. 102.

66. Jerry Marsh testified that Steve Lassiter would decide how much money Synico should transfer to Syglo based on how much was due to Madison. Jerry Marsh testified Steve Lassiter created internal invoices at Jerry Marsh's request to determine the amount owed to Syglo for the temporary employees, but these invoices were not sent to U.S. Bank or Bartech. Ex. 101 (amended), exhibit C.

67. Jerry Marsh also testified that the invoices sent to Madison were made by Syglo at the request of Madison, who informed him to create internal invoices in order for Madison to match his internal invoices with the payments Madison would make to employees. Jerry Marsh testified he discussed this arrangement with Amanda Naples and two other Madison employees. While the Court believes Madison employees likely communicated that Jerry Marsh would need invoices of the hours and pay rates of his temporary employees for each pay period, there is no evidence Madison employees knew that Jerry Marsh did not send these invoices to U.S. Bank/Bartech and that they were solely created for Madison. For example, exhibit 16 indicates the invoices used by Madison to pay Syglo's temporary employees list U.S. Bank/Bartech as the client to be billed by Syglo and gives the impression the invoices were sent from Syglo to U.S. Bank/Bartech.

68. In a different lawsuit, Jerry Marsh swore in an affidavit, "Attached as Exhibit C is an invoice sent by Syglo to U.S. Bank/Bartech." Jerry Marsh testified that his statement

under oath that invoices were sent by Syglo to U.S. Bank/Bartech was made in error. But, that is not believable, as the hiding of Synico is consistent with his past actions and with the testimony of Madison employees.

**Madison Terminates The Master Agreement With Syglo**

69.     Amanda Naples testified she noticed on May 18, 2016 that a wire transfer was received as payment for funds advanced by Madison to pay Syglo's temporary staff at U.S. Bank/Bartech. Amanda Naples considered a wire transfer to be an "odd situation" and inconsistent with past payments, which had been ACH payments. Therefore, she testified she brought the issue to her superiors.

70.     The wire transfer included information on the debit account and that account matched Syglo's bank account. Ex. 27.

71.     The normal ACH transfers received by Madison on the U.S. Bank/Bartech account for Syglo would not include information regarding the debit account and, therefore, Madison was not aware that Syglo had been transferring funds to Madison rather than U.S. Bank/Bartech as required by the Master Agreement. Test. of Amanda Naples.

72.     The May 18, 2016 wire transfer was the first time Madison became aware that they were not being paid by U.S. Bank/Bartech but, instead, were being paid by Syglo. Test. of Amanda Naples; test. of Richard Chipman.

73.     Other customers of Madison typically granted Madison access to a portal to check payments and invoices, but Jerry Marsh never did this for the U.S. Bank/Bartech account. Test. of Amanda Naples; ex. 93. (In an email exchange included in exhibit 93, Robert Gilbert discouraged Jerry Marsh from giving Madison access because "[w]e

need the ability to audit and edit timecard information that goes to Madison" as the portal included employees of Synico and Syglo.)

74.   Madison did not require access to U.S. Bank/Bartech's portal so long as Jerry Marsh provided frequent updates on payments, which he had done prior to the wire transfer in May 2016. Jerry Marsh testified he did not give portal access to Madison because Syglo was a subvendor and because Madison did not complain about the arrangement until payments were discontinued to Madison in May 2016. Amanda Naples testified that portal access was not required on the U.S. Bank/Bartech account, but she did not testify that she knew that portal access was denied because Syglo was a subvendor to Synico for that customer.

75.   Jerry Marsh testified that the wire transfer likely became necessary in May 2016 because the payment to Madison may have been overdue and he was unable to submit a payment in the typical manner.

76.   Following May 18, 2016, Syglo did not receive further payments from Synico on the subvendor contract regarding services rendered to U.S. Bank/Bartech because of a contract dispute between Bartech and Synico. Test. of Jerry Marsh; exs. 108-09. Because of this, Syglo was no longer able to pay Madison. Test. of Jerry Marsh.

77.   Madison stopped funding the Syglo temporary employees at U.S. Bank in May 2016. Test. of Jerry Marsh.

78.   On May 25, 2016, Jerry Marsh sent a letter to Madison identifying Syglo as a subvendor to Synico on the U.S. Bank/Bartech account. Ex. 28. According to employees of Madison, this was the first time Jerry Marsh informed them of the subvendor relationship. Test. of Melody Smith; Richard Chipman; Amanda Naples. Jerry Marsh

testified he had told employees of the subvendor relationship in 2014. But, for the reasons cited above, the Court does not find Jerry Marsh credible on this point because of the testimony by Madison's employees regarding the actions that disclosure would have triggered at Madison and no disclosure of the subvendor relationship was made in writing.

79.   Richard Chipman was informed of the subvendor contracts with ManPower and Adecco that Syglo disclosed to Madison in October 2014. Exs. 4-5. It was not until May 2016 that Richard Chipman learned of a potential subvendor relationship with Synico because of the wire transfer. This set off "alarm bells" because it showed the money was transferred from Syglo and not from U.S. Bank/Bartech. Test. of Richard Chipman.

80.   Richard Chipman testified that had Madison been informed of the subcontract with Synico, they would have investigated Synico as they investigate other clients and customers to determine creditworthiness before funding. Richard Chipman testified that Madison would have investigated the balance sheets of Synico and its secured lenders had it known about the subcontract.

81.   Richard Chipman testified that Madison would have refused to finance the subvendor relationship with Synico if they had been informed about the relationship because Synico was not creditworthy. Richard Chipman testified Synico was not creditworthy because it had tax liens for unpaid FICA taxes and because Synico had its own secured lender, Summit Community Bank. This bank could make a potentially superior claim to the account receivables on the U.S. Bank/Bartech payments that served as Madison's primary collateral.

21

82.  Richard Chipman testified that Madison, as part of its due diligence into clients, searches for tax liens and will not fund a company if there are unpaid tax liens, particularly if the tax lien relates to paycheck withholdings and trust funds.

83.  Synico had tax liens for unpaid FICA withholdings in 2014 and 2015, with assessed tax amounts due in 2014 and 2015 totaling $670,505.80. Ex. 157 (This amount is the total of the taxes assessed on November 17, 2014, November 24, 2014, and March 2, 2015. The IRS would eventually make a priority claim in Synico's bankruptcy for $951,971.18 in unpaid taxes and interest and a general unsecured claim of $432,298.78 as a penalty. Ex. 157.)

84.  Richard Chipman testified that Madison also would not have funded a company (such as Syglo) where the owner had a familial relationship with the owner of the customer (such as Synico).

85.  Richard Chipman testified that had Madison known of the subvendor relationship, it would have requested a copy of the subvendor agreement and would have specifically required language which would guaranty that Madison was entitled to receive accounts receivables. The agreement between Synico and Syglo does not include that language. Test. of Richard Chipman; ex. 32 ("Synico's obligation to pay Subvendor is expressly conditioned upon Synico's receiving payment from Client for services rendered to, for or on behalf of Client." Ex. 32 ¶ 2.4.)

86.  The subvendor agreement between Synico and Syglo was not provided to Madison and includes language Madison would not have permitted or agreed to fund. For example, paragraph 2.4 of exhibit 32 states "Synico's obligation to pay Subvendor is expressly conditioned upon Synico receiving payment from Client for services rendered to, for

22

or on behalf of client. . . . Subvendor agrees that in the event of client's delay, failure, refusal or inability to pay Synico for the services provided by Subvendor, Synico shall provide collection efforts to insure approved invoices are expedited."

87.  Richard Chipman testified that Madison would have "flatly denied" to fund Syglo on the U.S. Bank/Bartech staffing if it had known about the subvendor relationship with Synico, the familial relationship between the owners of the companies, the tax lien, and security interests other lenders had in Synico's accounts receivables. Richard Chipman's testimony on all points was very credible.

88.  In late May or early June 2016, representatives of Madison and Jerry Marsh, along with his counsel, held a telephone conference to discuss the irregularities concerning payments by Syglo and Syglo's relationship with Synico. Test. of Melody Smith. During the call, Jerry Marsh never mentioned that he believed Madison knew about the subvendor relationship or that he had informed Madison employees of the subvendor relationship. Test. of Melody Smith.

89.  On June 3, 2016, Madison sent an email to Jerry Marsh to follow up on the telephone call. Ex. 9. Madison requested information concerning the relationship between Synico and Syglo and any contract that existed between them. Ex. 9; test. of Melody Smith. Richard Chipman testified that he requested the information to know "how much trouble we're in."

90.  Jerry Marsh did not respond to the request for information. He testified that he had already provided most of the information to Melody Smith or other employees of Madison before and after signing the Master Agreement and that he did not intend to

keep this information from Melody Smith. Again, this was not credible testimony for the reasons stated above.

91.     On June 30, 2016, Madison sent a letter terminating the Master Agreement with Syglo. Stip. ¶ 15; ex. 33. Madison alleged material breaches of the Master Agreement, including making false representations to Madison related to Syglo's relationships with its customers and collecting accounts receivables due to Madison. Ex. 33.

92.     Jerry Marsh did not respond to Madison's demand for payment and termination of contract. Test. of Jerry Marsh.

93.     In total, Madison is owed $1,676,162.20 for the payments made to temporary employees of Syglo at U.S. Bank/Bartech at the time Madison terminated the Master Agreement. Ex. 33.

94.     Jerry Marsh owes $1,676, 162.20 pursuant to his personal guaranty of the debt of Syglo to Madison. Exs. 8; 33.

95.     During the trial, counsel for Madison waived a liquidated damages provision of $82,291.88 as a remedy for the default under the Master Agreement.

**Synico, Syglo, Jerry Marsh And Robert Marsh Petition For Bankruptcy Relief**

96.     After Madison terminated the Master Agreement, Madison initiated a lawsuit in Minnesota district court against Syglo, Jerry Marsh, Synico, Robert Marsh, Bartech, and Anchor Bank, among others. Exs. 101; 113 (Madison Resource Funding Corp. v. Syglo, LLC, No. 27-CV-16-1006); Sawicki Dep. Attachment (Decl. of Ricardo J. Lara, Jr.).

97.     Syglo filed for bankruptcy on August 24, 2016. Stip. ¶ 16.

98.     Jerry Marsh filed for bankruptcy on August 29, 2016. Stip. ¶ 17; ex. 112.

99.     Synico filed for bankruptcy on November 28, 2016. Stip. ¶ 18; ex. 146.

100.    Robert Marsh filed for bankruptcy on October 18, 2018. Stip. ¶ 19.

101.    Jerry Marsh did not initiate a lawsuit against his brother or take formal action to recover money from Synico for unpaid services provided to U.S. Bank/Bartech under the subcontract relationship. Test. of Jerry Marsh.

**Jerry Marsh Disposes Of His Business Laptop**

102.    In late November 2016, after this case was commenced, Jerry Marsh discarded the only laptop from which he conducted business for Syglo, telling his attorney at the time (as indicated in an email from that attorney to Madison's counsel) that it was "fried" and unusable. Ex. 114.

103.    The laptop was included in an August 2016 discovery request made in a lawsuit filed by Madison against Jerry Marsh and Syglo, among others. Ex. 113. Nonetheless, it was discarded.

104.    Jerry Marsh testified that the laptop became nonfunctional in September 2016.

105.    Jerry Marsh had included the laptop in his bankruptcy petition on September 8, 2016, assigning it a value of $400.00. Ex. 112.

106.    John Carney was retained by Madison to review evidence on computers belonging to Synico and to consult regarding Jerry Marsh's discarded laptop. He is a digital forensics examiner and principal at Carney Forensics, which has operated since 2008. His job involves examining mobile and computer devices for digital evidence and recovering the evidence. John Carney holds a Bachelor of Science degree and a law degree, and completed specialty courses in digital forensics. He holds certificates from Cellebrite

in mobile device forensics, and a certificate from Access Data in computer forensics.

He has testified as an expert in other cases. Test. of John Carney.

107.   Madison gave notice of its intent to offer John Carney's testimony as expert testimony,

Dkt. No. 83, but did not move to qualify John Carney as an expert during the trial.

108.   Based on John Carney's experience and Jerry Marsh's explanation of the damage to the

computer John Carney believes that electronic information could have been recovered

from the hard drive of Jerry Marsh's computer before Jerry Marsh disposed of it.

109.   John Carney also analyzed two computers and an additional hard drive owned by

Synico and in possession of the trustee of Synico's bankruptcy estate. He was also able

to analyze five other computers belonging to Synico recovered from a property

management office.

110.   John Carney was not able to recover any QuickBooks (computer software) files from

eight of the hard drives on the computers but was able to locate links to QuickBooks

files that had been deleted for both Synico and Syglo. John Carney was able to recover

40 QuickBooks files on one of the computers. Of those QuickBooks files, none had

been accessed in 2016, and only four had been accessed in early 2015. Thirty-eight of

the QuickBooks files related to Synico and two related to Syglo.

111.   John Carney located a file called core shredder on a computer identified as the computer

used to hold QuickBooks files. This program was used to permanently delete files and

data but had been installed on the computer as early as March 2013. Exs. 151; 158.

112.   In John Carney's opinion, eight of the nine computers/hard drives had been

intentionally spoliated.

**Madison Makes A Request For Admissions**

113.    Madison sent a request for admissions to Jerry Marsh's home in March 2019 as part of this adversary proceeding at a time when Jerry Marsh was not represented by counsel. Ex. 148; Dkt. No. 124. It is undisputed no responses were ever made.

**Credibility Determination**

114.    The testimony of the Madison employees, Melody Smith, Amanda Naples, Molly McQuillen, and Richard Chipman, was very credible.

115.    Areas of testimony by Jerry Marsh and Robert Gilbert which the Court did not find credible have been noted in the findings of fact above.

**Ultimate Facts**

116.    Jerry Marsh knew Syglo had a subvendor relationship with Synico regarding staffing U.S. Bank/Bartech and he did not disclose this fact to Madison.

117.    Jerry Marsh also knew that Syglo did not have a direct relationship with U.S. Bank/Bartech, but he falsely represented to Madison (or represented by omission) that Syglo had the direct customer relationship. Jerry Marsh knew the receivables Madison was financing (or purchasing) and constituting its collateral were not owed directly by US Bank/Bartech but, rather, owed by Synico.

118.    Jerry Marsh knew that U.S. Bank/Bartech would not pay Madison directly, but falsely represented that funds deposited to Madison were from U.S. Bank/Bartech.

119.    Jerry Marsh made the representations and omissions with the intent to deceive Madison regarding its relationship with Synico and to induce Madison to finance Syglo's temporary staff at U.S. Bank/Bartech.

120.    Madison was induced to finance Syglo for the U.S. Bank/Bartech payroll upon Jerry
Marsh's misrepresentations that Syglo had a direct client relationship with U.S.
Bank/Bartech and when he omitted the fact that Syglo was a subvendor to Synico
(which had the direct relationship with U.S. Bank/Bartech).

121.    Madison would not have made the loans to fund U.S. Bank/Bartech payroll to Syglo if
it had known that Syglo was a subvendor of Synico, that U.S. Bank/Bartech was not
the direct customer, and that U.S. Bank/Bartech would not be paying Madison directly.

122.    Madison's reliance upon Jerry Marsh's misrepresentations was justified and reasonable
in light of the information provided by Jerry Marsh, the normal procedures it followed,
and the relationship between Madison and Syglo.

123.    Madison was damaged in the amount of $1,676,162.20[1] plus prejudgment interest,
attorney's fees, and costs as the proximate and foreseeable cause of Jerry Marsh's
misrepresentations.

## Analysis

**I.      The Court Denies Madison's Request For Sanctions Related To Spoliation Of
Evidence As Untimely.**

On February 19, 2020, approximately one week prior to the scheduled start of trial,

Madison filed an expedited motion in limine seeking sanctions against Jerry Marsh for the

destruction of the only laptop he used to conduct Syglo's business. Dkt. No. 126. The motion

alleged that Jerry Marsh destroyed the laptop in November 2016 after Madison filed this adversary

---

[1] Throughout the filings in this adversary proceeding, Madison has declared its damages to be $1,676,162.20, $1,676,162.00, and $1,676.162.50.  Based on the testimony of Richard Chipman and the evidence adduced at trial, including exhibit 33, the Court concludes the amount of damages related to the U.S. Bank/Bartech payments to be $1,676,162.20.

proceeding and after it requested Jerry Marsh produce the laptop through discovery in a separate

legal matter. Dkt. No. 126 at 1. Madison sought sanctions under Federal Rule of Civil Procedure

37(e)(1) and (2) because the destruction of the laptop prejudiced Madison and was destroyed

intentionally to deprive Madison of evidence. Dkt. No. 126 at 2. Madison argued it is entitled to

the following adverse instructions at trial on the basis of spoliation by Jerry Marsh: (1) that the

computer contained Syglo's financial information; (2) that the information would have confirmed

that Jerry Marsh took direct custody of funds sent to Syglo by Synico on behalf of U.S. Bank and

would have revealed the current location of those funds; and (3) that by destroying the laptop,

Jerry Marsh admits these facts. Dkt. No. 126 at 4. At trial, the Court took the motion under

advisement and allowed Madison to present evidence concerning their attempts to collect

electronic information from other computers owned by Synico.

Federal Rule of Civil Procedure 37(e), as applied to this adversary proceeding by Federal

Rule of Bankruptcy Procedure 7037, provides:

> If electronically stored information that should have been preserved
> in the anticipation or conduct of litigation is lost because a party
> failed to take reasonable steps to preserve it, and it cannot be
> restored or replaced through additional discovery, the court:
>     (1) upon finding prejudice to another party from loss of the
> information, may order measures no greater than necessary to cure
> the prejudice; or
>     (2) only upon finding that the party acted with the intent to
> deprive another party of the information's use in the litigation may:
>         (A) presume that the lost information was unfavorable to the
> party;
>         (B) instruct the jury that it may or must presume the
> information was unfavorable to the party; or
>         (C) dismiss the action or enter a default judgment.

While sanctions in this case may have been appropriate for spoliation of evidence in other

circumstances, the Court declines to order the requested sanction because the request is untimely

for two reasons. First, all nondispositive motions in this matter were required to be brought by November 18, 2019 and all dispositive motions were required to be brought by December 18, 2019. Dkt. No. 95 at 1. This motion was only brought one week prior to trial, on February 19, 2020, and without following the procedural requirements for motions in adversary proceedings. See Local Rule 7007-1(a) (requiring motions in adversary proceedings to follow Local Rules 9013-1, 9013-2, 9006-1, and 9017-1); Local Rule 9006-1 (requiring moving documents to be filed 14 days prior to a hearing or the party must request an expedited hearing on the motion). The failure of Madison to follow either the Court's scheduling order for pretrial motions or the rules pertaining to motions in adversary proceedings is grounds for the Court to decline to grant the requested relief. Gov't Employees Ins. Co. v. KJ Chiropractic Ctr. LLC, 2015 WL 12838853, at *2 (M.D. Fla. Jan. 15, 2015) (denying a motion, styled as a motion in limine, as untimely because it was filed after the deadline set for filing motions); accord Novotny v. Weatherford Int'l, LLC, 2018 WL 4053871, at *1 (D.N.D. May 9, 2018).

The Court likewise declines to grant the request for sanctions because the request pertains to a discovery matter that Madison has been aware of for over three years. In the motion in limine, Madison admits it was informed on January 30, 2017 that Jerry Marsh intentionally destroyed the computer in November 2016. Dkt. No. 126 at 3. Yet, this spoliation motion, framed as a motion in limine, was not brought until the eve of trial on an expedited basis. The time to bring a motion for a discovery sanction was earlier in the proceedings, not on an expedited basis immediately prior to trial. Requests for sanctions related to discovery may be denied as untimely if the motion is unreasonably delayed. See Brandt v. Vulcan, Inc., 30 F.3d 752, 756 (7th Cir. 1994) (applying "unreasonable delay" standard in the context of Rule 37(b) in the absence of a specified time limit); Mercy v. County of Suffolk, 748 F.2d 52, 56 (2d Cir. 1984) ("[A] motion for Rule 37 sanctions

should be promptly made, thereby allowing the judge to rule on the matter when it is still fresh in his mind. . . . Indeed, the motion should normally be deemed waived if it is not made prior to trial . . . ."); <u>Shamis v. Ambassador Factors Corp.</u>, 34 F. Supp. 2d 879, 886 (S.D.N.Y.1999) ("While Rule 37 does not establish any time limits within which a motion for sanctions must be filed, unreasonable delay may render such motions untimely."); <u>Doctor John's, Inc. v. City of Sioux City</u>, 2007 WL 5788, *3-4 (N.D. Iowa Jan. 2, 2007) (denying a motion in limine as tardy where the motion sought to compel documents identified a year earlier); <u>Barclay v. Mercy Health Servs.-Iowa Corp.</u>, 2009 WL 939846, at *6 (N.D. Iowa Apr. 6, 2009) (denying as untimely a motion in limine that sought to compel discovery).

Further, Fed. R. Civ. P. 37(e) is a rule that leaves the decision whether to issue a sanction to the discretion of the Court. <u>See</u> Fed. R. Civ. P. 37(e) (using "may" to describe authority of court to issue sanctions). While the Court denies the motion in limine, the Court heard the testimony during trial concerning Jerry Marsh's disposal of the computer and can take this evidence into consideration when considering the credibility of witness testimony. Counsel for Jerry Marsh admitted during closing arguments that the act of disposing of the laptop can be taken into consideration in the Court's consideration of whether fraud occurred.

Finally, the Court finds that Jerry Marsh, on behalf of Syglo, took possession of funds owed to Madison from U.S. Bank/Bartech when they were transferred from U.S. Bank/Bartech to Synico and then from Synico to Syglo. Therefore, the facts that Madison sought for the adverse inference instruction were proven at trial in any event.

## II.      Madison Established The Elements Of Section 523(a)(2)(A).

The sole allegation in this adversary proceeding arises under section 523(a)(2)(A). Section 523(a)(2)(A) provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt--
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

To except a debt from discharge under section 523(a), a creditor must prove the elements of fraud by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286-87 (1991); Treadwell v. Glenstone Lodge, Inc. (In re Treadwell ), 637 F.3d 855, 860 (8th Cir. 2011). To establish non-dischargeability of a debt on the basis of a false representation (as pled by Madison) under section 523(a)(2)(A), the creditor must prove there is a debt and the following elements.

> 1. The debtor made a representation.
> 2. The debtor knew the representation was false at the time it was made.
> 3. The representation was deliberately made for the purpose of deceiving the creditor.
> 4. The creditor justifiably relied on the representation.
> 5. The creditor sustained the alleged loss as the proximate result of the representation having been made.

R & R Ready Mix v. Freier (In re Freier), 604 F.3d 583, 587 (8th Cir. 2010); see In re Scott, 403 B.R. 25, 37 (Bankr. D. Minn. 2009) ("The wrongdoing targeted by the statute is a debtor's inducement to a creditor to make a loan, to give money, or to transfer property or services, through the use of a false representation of fact made *before* the credit was extended or the transfer was effected.").

Madison alleged in the amended complaint that Jerry Marsh "represented to Madison that Syglo had been hired by and contracted with Cargill, Inc., Cargill/Ardent Mills, U.S. Bank/Bartech and Contemporary Services Corporation," that this was a material misrepresentation, and that Jerry Marsh further omitted material facts. Dkt. No. 42 ¶ 34. Madison alleged that it relied on those

32

misrepresentations and omissions when it entered into the Master Agreement and Security Agreement and advanced money under the contracts. Dkt. No. 42 ¶ 35. Madison alleged that it would not have entered into the agreements or advanced money if Jerry Marsh had not made the material misrepresentations and omissions. Dkt. No. 42 ¶ 36. Madison alleged that it is owed $1,676,162.20 for the amount that it should have been paid for funding U.S. Bank/Bartech and an additional $21,051.30 for amounts it should have been paid for funding Cargill, Inc., Cargill/Ardent Mills, and Contemporary Services Corporation. Dkt. No. 42 ¶ 37.

At trial, the focus of the evidence and argument regarded the misrepresentations concerning Syglo's subvendor relationship with Synico related to Madison's payments to the temporary employees provided to U.S. Bank/Bartech. Madison's trial brief, likewise indicates it seeks damages for the funds advanced to pay the temporary employees provided to U.S. Bank/Bartech, plus attorney's fees and interest. Dkt. Nos. 121-22.

### A.  Madison Established A Debt.

To except a debt from discharge under any part of 11 U.S.C. § 523(a)(2)(A), there must be a "debt." Reuter v. Cutcliff (In re Reuter), 686 F.3d 511, 515-16 (8th Cir. 2012); Hernandez v. Sulier (In re Sulier), 541 B.R. 867, 877 (Bankr. D. Minn. 2015) ("In order to prove that the debt is nondischargeable, the plaintiff here must first establish that the defendant owes him a debt."). Section 523(a)(2)(A) states, "A discharge . . . does not discharge an individual debtor from any debt . . . for money property, services, or an extension, renewal, or refinancing of credit to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ." Section 101(12) of the Bankruptcy Code defines "debt" as "liability on a claim." The term "claim" is defined as a "right to payment" under 11 U.S.C. § 101(5)(A). Exhibit 33 and the testimony of the Madison employees clearly established a debt arising from breach of contract (ex. 6) of $1,676,162.20 owed

by Syglo to Madison and guaranteed by Jerry Marsh (ex. 8) related to employees supplied to U.S. Bank/Bartech.

### B.  Knowing False Representation

"For purposes of section 523(a)(2)(A), a 'misrepresentation' denotes 'not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth.'" Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (quoting LA Capitol Fed. Credit Union v. Melancon (Melancon), 223 B.R. 300, 308-09 (Bankr. M.D. La. 1998)). A misrepresentation may also occur through silence. In re Juve, 761 F.3d 847, 853 (8th Cir. 2014); Caspers v. Van Horne (In re Van Horne), 823 F.2d 1285, 1288 (8th Cir. 1987), abrogated on other grounds, Grogan, 498 U.S. 279. While a misrepresentation must relate to past or present fact to qualify under section 523(a)(2)(A), a debtor's promise related to a future act can constitute fraud if the debtor possessed no intent to perform the act at the time the promise was made. Koller v. Hoffman (In re Hoffmann), 475 B.R. 692, 700 (Bankr. D. Minn. 2012); Shea v. Shea (In re Shea), 221 B.R. 491, 496-97 (Bankr. D. Minn. 1998).

Madison alleged Jerry Marsh made the following misrepresentations or omissions and that Jerry Marsh knew they were false at the time they were made: (1) Jerry Marsh misrepresented that U.S. Bank/Bartech was the direct customer of Syglo on multiple occasions; (2) Jerry Marsh omitted the fact that Syglo was a subvendor of Synico to supply employees to U.S. Bank/Bartech; (3) Jerry Marsh misrepresented that he was sending invoices directly to U.S. Bank; and (4) Jerry Marsh misrepresented that U.S. Bank was directly making payments to Madison. The third and fourth representations were made after Madison initially agreed to fund U.S. Bank/Bartech but before the funds were advanced that were not paid in early 2016 constituting the debt owed by Jerry Marsh. Madison had continually advanced funds during the relationship and Syglo paid

34

Madison until early 2016. The misrepresentations (omissions) were made upon each advance and furthered the funding of Syglo on the U.S. Bank/Bartech employees. Without them, Madison would have discovered that U.S. Bank/Bartech was not Syglo's direct client at an earlier time and would likely have terminated funding Syglo upon discovery. More importantly, they show the consistent intent to hide Synico as the actual vendor to U.S. Bank/Bartech.

Jerry Marsh argued that he presented evidence through testimony that he informed Madison of the subvendor relationship, that he was told by Madison to create the internal invoices, and that Madison knew he took possession of the accounts receivables before sending them to Madison. The Court does not find Jerry Marsh's testimony regarding these communications to be credible in light of the testimony from Madison employees that they were never told this information. Any of these communications would have been a "red flag" that would have led to further investigation and a report to the employees' superiors. And, as explained below, if Madison knew of the subvendor contract with Synico, it would have led to the denial of funding or, if learned later, the cessation of funding. Likewise, Madison provided multiple exhibits in which Jerry Marsh falsely referred to U.S. Bank/Bartech as Syglo's customer and that payments would come from U.S. Bank/Bartech to Madison. Exs. 10; 11; 16; 22; 24-26. Further, Jerry Marsh disclosed subvendor contracts with ManPower and Adecco in writing, ex. 4, as agreed, but failed to disclose the subvendor contract with Synico relating to U.S. Bank/Bartech. The Court finds the testimony and evidence presented by Madison to be more credible than Jerry Marsh's testimony that he disclosed the subvendor relationship to Madison. The relationship of Syglo with Synico is a material omission of facts that Jerry Marsh knew he had to disclose to Madison.

Jerry Marsh testified that he did not disclose the subvendor contract with Synico at the time he disclosed other subvendor contracts because the subvendor contract was dormant at the time. It

is true that Jerry Marsh did not seek funding for U.S. Bank/Bartech for several months after he initially disclosed the other subvendor contracts to Madison. To the extent Jerry Marsh argues this negates any knowing falsity of his omission regarding the subvendor relationship or his representation that U.S. Bank/Bartech was Syglo's client, the Court is not convinced. "A representation that is truthful but that the maker knows or believes is materially misleading because of a failure to state additional or qualifying matter is also a fraudulent misrepresentation." <u>Sulier</u>, 541 B.R. at 879. Jerry Marsh testified that he knew a subvendor agreement must be disclosed to Madison and counsel for Jerry Marsh agreed in closing argument that it would be material for Madison to know of any subvendor relationship prior to agreeing to fund the client. Jerry Marsh may not have had a duty to disclose the subvendor agreement in 2014, but he knew it needed to be disclosed when he sought funding for U.S. Bank/Bartech (as demonstrated by his written disclosure of ManPower and Adecco) and he omitted that information on multiple occasions. He failed to inform Madison employees of the truth of the subvendor relationship, the nature of the relationship with U.S. Bank/Bartech, and the nature of the payments to Madison.

Jerry Marsh's conduct, in omitting this information from Madison and his actions in directly communicating material misinformation he knew was misleading regarding the relationship between Syglo and U.S. Bank/Bartech constitutes knowing false misrepresentations. <u>See</u> <u>Moen</u>, 238 B.R. at 791; <u>Van Horne</u>, 823 F.2d at 1288 ("While it is certainly not practicable to require the debtor to 'bare his soul' before the creditor, the creditor has the right to know those facts touching upon the essence of the transaction."). This is especially true in light of Jerry Marsh's years of experience in executive roles at temporary staffing agencies. Jerry Marsh, through his experience knew the importance of informing a factoring agency of any subvendor relationships and he knowingly failed to do so.

The Court concludes that Jerry Marsh not informing Madison of the subvendor relationship between Synico and Syglo when requesting funding for the placement of temporary employees with U.S. Bank/Bartech constitutes a false representation by omission. Jerry Marsh also falsely and affirmatively represented that U.S. Bank/Bartech was Syglo's direct customer to be funded despite his knowledge that U.S. Bank/Bartech was a direct customer of Synico. Jerry Marsh misrepresented that deposits were made from U.S. Bank/Bartech to Madison and omitted that Syglo took possession of accounts receivables owed to Madison for funding temporary employees at U.S. Bank/Bartech. While this misrepresentation occurred after Madison had agreed to fund the temporary employees at U.S. Bank/Bartech, the misrepresentation induced Madison's continued advances made throughout 2015 and the beginning of 2016. They also show the intent to hide Synico as a vendor from Madison. All of these direct representations or omissions were knowingly false or omitted when Jerry Marsh knew Madison was operating under a misapprehension of the facts.

### C.  Intent To Deceive

Direct evidence of an intent to deceive is rarely available and, therefore, courts will look at all of the circumstances surrounding the misrepresentations to determine intent. Moen, 238 B.R. at 792; see Fields v. Fields (In re Fields), 510 B.R. 227, 236 (B.A.P. 8th Cir. 2014). Malevolence or ill-will is not required for the intent element to be satisfied. Moen, 238 B.R. at 791; Hoffmann, 475 B.R. at 701. And, in fact, there is no evidence of malice by Jerry Marsh in this case. However, "it does require that [the Debtor] act with intent to induce the plaintiff to rely on that misrepresentation." Sulier, 541 B.R. at 882 (citing Moen, 238 B.R. at 791). When considering whether this scienter element is satisfied, courts will determine whether the following existed: "The maker of the representation must (a) know or believe that the matter is not as he represents

37

it to be; (b) lack confidence in the accuracy of his representation; or (c) know that he does not have the basis for the representation." Sulier, 541 B.R. at 879.

At trial, Jerry Marsh testified that he had not intended to deceive Madison and explained many of the misrepresentations or omissions were simply miscommunications, a misunderstanding, or an error on the part of Madison. The Court is not persuaded. Jerry Marsh repeatedly referred to U.S. Bank/Bartech as Syglo's customer despite knowing that Syglo had no direct customer relationship with U.S. Bank/Bartech and despite knowing that a subvendor contract was required to be disclosed to Madison before Madison would agree to fund a client. He undertook actions to continue to facilitate his misrepresentations, including: (1) addressing invoices provided to Madison as though they were sent to U.S. Bank/Bartech; (2) failing to disclose the subvendor contract despite knowing that it needed to be disclosed after disclosing the subcontracts with two other companies (ManPower and Adecco); (3) failing to correct Madison employees when they referred to Syglo's customer as U.S. Bank/Bartech; and (4) falsely indicating payments would be made from U.S. Bank/Bartech when they were made by Syglo after receiving funds from Synico. There were many opportunities to disclose the Synico relationship and Jerry Marsh never did so. All of this behavior shows an intent to deceive Madison during the entire relationship.

Jerry Marsh testified that he knew the subvendor relationship with Synico was required to be disclosed. Given his vast experience in temporary staffing services, he must have known funding would be rejected if Synico had been disclosed as an intermediary. Given all of the evidence provided to the Court regarding Jerry Marsh's experience in temporary staffing agencies, his leadership role at Synico, and his behavior and communications with Madison, Jerry Marsh acted with the intent to deceive Madison regarding the subvendor relationship with Synico.

38

Finally, while it is not necessary to the Court's conclusion to consider the evidence of Jerry Marsh's disposal of the only laptop on which Syglo communications were held, subsequent conduct may be considered when determining whether a debtor had a fraudulent intent at the time he made misrepresentations. <u>Williamson v. Busconi</u>, 87 F.3d 602, 603 (1st Cir. 1996). Counsel for Jerry Marsh agreed during closing statements that later acts may be considered in a fraud determination. Jerry Marsh's disposal of the computer after litigation was commenced by Madison against him is further evidence that he acted with the intent to deceive Madison concerning the U.S. Bank/Bartech and Synico contract. But, even without evidence of the laptop disposal, the Court concludes that Madison met its burden of proving an intent to deceive by a preponderance of the evidence.

### D.  Justifiable Reliance

Section 523(a)(2)(A) requires only a showing of "justifiable" reliance by the creditor on the misrepresentations, rather than "reasonable" reliance. <u>Field v. Mans</u>, 516 U.S. 59, 73-75 (1995). Unlike reasonable reliance, justifiable reliance "does not mean that [the creditor's] conduct must conform to the standard of the reasonable [person]." <u>Id.</u> at 70-71. Rather, it only requires that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." <u>Id.</u> at 71.

Courts analyzing this element examine various factors to determine whether a creditor's reliance was justifiable, including:

> (1) the parties' previous business dealings; (2) events which might have put the creditor on notice that the representations were not well-founded; (3) whether a simple inquiry or request for additional information might have revealed the misinformation; (4) the course of dealings between the creditor and the debtor; and (5) information commonly known about the particular industry.

<u>Sulier</u>, 541 B.R. at 882. However, "[e]ven when an investigation would have revealed the falsity of the representation, reliance may be justifiable." <u>Islamov v. Ungar (In re Ungar)</u>, 429 B.R. 668, 673 (B.A.P. 8th Cir. 2010), <u>aff'd</u>, 633 F.3d 675 (8th Cir. 2011). For example, in <u>Ungar</u>, the Eighth Circuit Bankruptcy Appellate Panel concluded that a creditor's reliance was justifiable based on the established relationship of trust between the debtor and creditor, and the creditor had no duty to investigate the truth of the debtor's representations when "[n]o 'red flags' were raised." 429 B.R. at 674.

Madison alleged that Jerry Marsh's misrepresentations and omissions led Madison to believe that the funding it advanced on behalf of Syglo would be collateralized by Syglo's rights to collect payment directly from U.S. Bank or Bartech. Jerry Marsh argued that Madison could not justifiably rely on any representations that U.S. Bank/Bartech was Jerry Marsh's direct customer because Madison could have discovered this information if it requested a copy of Syglo's (non-existent) contract with Bartech, which it did not do as part of its due diligence prior to agreeing to fund the temporary employees provided to U.S. Bank/Bartech. Likewise, Jerry Marsh argued that it was not typical for a Madison client to refuse access to an online portal to check employees' hours prior to issuing payroll.

However, the Court received evidence that Jerry Marsh previously disclosed subvendor contracts with ManPower and Adecco in writing when requesting new customers be funded by Madison. Therefore, Madison could rely on Jerry Marsh to know to disclose subvendor contracts when requesting funding for a new customer. The previous disclosure of subvendor contracts is not only a strong indication that Jerry Marsh intended to deceive Madison when he did not disclose the subvendor contract with Synico, but also led Madison to believe it could rely on Jerry Marsh to disclose subvendor relationships. And, while Madison could have requested a copy of Syglo's

40

(non-existent) contract with Bartech, it was not required as part of Madison's due diligence into whether to fund U.S. Bank/Bartech staffing.

Jerry Marsh argued that Madison cannot satisfy the justifiable reliance element because it would have known about the Synico and Syglo subvendor relationship and the direct payments if it had required portal access. However, exhibit 93 (an email in which Robert Gilbert discouraged Jerry Marsh from giving Madison portal access) and Jerry Marsh's testimony supports a finding that Jerry Marsh purposefully avoided giving Madison portal access. Jerry Marsh did so because Syglo was only a subvendor to Synico on the U.S. Bank/Bartech contract and portal access would allow Madison to see that both Syglo and Synico employees were included on the portal disclosing the Synico connection.

Amanda Naples, a Madison employee, testified that clients did not always give Madison access to online portals. Importantly, it was not required that clients do so as long as payments continued to be made. Amanda Naples provided testimony that customers (such as Syglo) who did not provide access to online portals used a "match and file" system, where Madison would use the staffing agency's "internal invoices and match them up to what [Madison has] created in the AR manager system." Ex. 15. Here, Syglo used the "match and file" system and payments continued to be made until May 2016. Therefore, Madison did not act to require access to the portal.

Jerry Marsh also argued that there can be no justifiable reliance on the part of Madison because Jerry Marsh told them about the subvendor relationship with Synico in 2014 and Madison was aware of Synico's existence as demonstrated by their attempts to contact Synico in 2014 and 2015. As discussed above, the Court does not find it credible that Jerry Marsh informed Madison of the subvendor relationship with Synico. Madison's sales contacts with Synico in 2014 and 2015 do not prove that Madison was aware of the subvendor relationship. Counsel for Jerry Marsh

41

argued in closing that Madison knew about the relationship between Synico and Syglo because of customer-contact notes kept on Madison's system. Ex. 2. The notes indicate Madison employees attempted to contact Robert Marsh and Synico in 2015 and 2016. Ex. 2. But, the evidence indicates that Madison attempted to contact and seek Synico only as a customer, not in relation to any vendor or subvendor relationship in connection to Syglo. Based on notes of Madison employees, ex. 3, and Melody Smith's testimony as to how Madison reached out to staffing services in order to sell Madison's services, it is clear Madison only pursued Synico as a customer in 2014, 2015, and 2016. This does not show Madison had any knowledge of Synico's subvendor relationship with Syglo.

There is evidence that Madison staff communicated with Synico staff regarding funding of Syglo's temporary employees. Exs. 21; 101 at Exhibit E. However, the emails from Madison do not disclose that the Madison employee noticed the employee was from Synico rather than Syglo. More importantly, the emails in no way show Madison knew of or should have known of the subvendor relationship.

Based on the entirety of the circumstances, it was justifiable that Madison relied on Jerry Marsh's representations that U.S. Bank/Bartech was Syglo's direct customer and no subvendor relationship existed. Based on the circumstances and communications between the two parties, Madison was not required to inquire whether Jerry Marsh was hiding a subvendor relationship that would put Madison's interest in Syglo's accounts receivables at risk in order to have justifiably relied on Jerry Marsh's representations. Given the history of interactions between Madison and Jerry Marsh, Madison was not put on notice of some irregularity that warranted additional investigation into Syglo and Synico until the payment irregularly was discovered in May 2016.

Madison acted reasonably. In fact, it appears Madison followed its normal procedures and due diligence given the information provided to it. Justified reliance has been proven.

### E. Proximate Cause

The element of proximate cause "requires the plaintiff to show that the action of the debtor was the act, without which the plaintiff would not have suffered the loss complained of." Kassebaum v. Smith (In re Smith), 591 B.R. 741, 750 (Bankr. D. Minn. 2018). Proximate cause "will be satisfied, even in the presence of other contributing factors, as long as the misrepresentation was material to the lender's decision to grant the loan and the lender's losses were a foreseeable consequence of the debtor's conduct." Beneficial Nat'l Bank v. Priestley (In re Priestley), 201 B.R. 875, 886 (Bankr. D. Del. 1996).

The Court received credible testimony from Richard Chipman, who had final approval of the customers Madison agreed to finance, that Madison would not have advanced funds for the payroll of Syglo's temporary employees at U.S. Bank/Bartech if Jerry Marsh had informed Madison that Syglo was a subvendor of Synico to provide employees to U.S. Bank/Bartech. Richard Chipman testified credibly that Madison would not have approved funding with Synico's involvement because Synico was not creditworthy. The subvendor relationship and contract terms placed Madison's ability to recover Syglo's accounts receivables at risk because of Synico's significant tax liabilities and because Synico's secured lender (Summit Community Bank) would have access to the money before Syglo. Richard Chipman credibly testified that Madison sought to be the first priority secured lender on its clients' accounts receivables. The other Madison employees' credible testimony supports his testimony.

Further, it is clear Madison would have ceased funding as soon as it learned of the fraud. And, it did so in May 2016 after learning of the fraud. Ex. 33. As a result of the omission of the

subvendor relationship with Synico and misrepresentation that U.S. Bank/Bartech was Syglo's customer, Madison ultimately advanced funds in the amount of $1,676,162.20 to pay Syglo's temporary employees at U.S. Bank/Bartech which was not repaid.

These damages were a foreseeable consequence of Jerry Marsh's material misrepresentations and Madison's justifiable reliance upon them by inducing Madison to fund the U.S. Bank/Bartech staffing. It was foreseeable that Madison would be ultimately damaged if any default occurred between Synico and U.S. Bank/Bartech or between Synico and Syglo because Madison was not receiving the funds directly from U.S. Bank/Bartech. It was also foreseeable that Madison would be damaged in funding Syglo's U.S. Bank/Bartech staffing in light of the financial situation of Synico, whose assets were secured by Summit Community Bank and, according to Richard Chipman, was not creditworthy.[2]

### III. Alternatively, The Non-Dischargeability Of Jerry Marsh's Debt Can Be Established By His Failure To Respond To Madison's Requests for Admission.

Jerry Marsh was served with requests for admission while pro se. It is undisputed that he failed to respond to these requests. His counsel appeared in the case on May 13, 2019. Dkt. No. 84. At the latest, counsel for Jerry Marsh had to become aware of the failure to respond at the time of the pretrial submissions on February 18, 2020. Dkt. Nos. 121 at 13-14; 122 at 16-17. The

---

[2] Having established the elements of section 523(a)(2)(A), Madison has also established a claim for intentional misrepresentation under Minnesota law which can alternatively form the basis for a "debt" as discussed above (Section II.A). In addition to the requirements of section 523(a)(2)(A), Minnesota law requires the representation relate to a past or present fact, be material, and be susceptible of knowledge with the intent to induce the person to act. M.H. & J. v. Caritas Family Servs., 488 N.W.2d 282, 289 (Minn. 1992). There is no question (and the Court finds) the misrepresentations discussed above had to do with a past or present fact (US Bank as a direct customer, etc.), were material, susceptible of knowledge and intended to induce Madison to act.

proposed findings of fact and trial brief for Madison clearly cited Jerry Marsh's failure to respond to the requests for admission as support for a judgment in its favor.

Federal Rule of Civil Procedure 36(a)(3), as incorporated by Federal Rule of Bankruptcy Procedure 7036, provides: "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Further, "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b) (emphasis added). "[W]hen a party has made no filing that could be construed as a motion to withdraw or amend an admission, the court is required to give the admission conclusive effect." Stine Seed Co. v. A & W Agribusiness, LLC, 862 F.3d 1094, 1102 (8th Cir. 2017); see Quasius v. Schwan Food Co., 596 F.3d 947, 950-52 (8th Cir. 2010). "An admission that is not withdrawn or amended cannot be rebutted by contrary testimony or ignored by the . . . court . . . . Mere trial testimony [does] not constitute a motion . . . ." AAA v. AAA Legal Clinic of Jefferson Crooke, P.C., 930 F.2d 1117, 1120 (5th Cir. 1991); see Fed. R. Civ. P. 36(b) advisory committee's note to 1970 amendment; Airco Indus. Gases, Inc. Div. of BOC Grp., Inc. v. Teamsters Health & Welfare Pension Fund, 850 F.2d 1028, 1035-37 (3d Cir. 1988).

Some courts recognize that to be established against a pro se litigant, the self-represented individual must be made aware of the consequences of a failure to respond to the requests for admissions. See Medina v. Donahoe, 854 F. Supp. 2d 733, 748 (N.D. Cal. 2012); Citibank (S.D.), N.A. v. Savage (In re Savage), 303 B.R. 766, 773 (Bankr. D. Md. 2003); United States v. Turk, 139 F.R.D. 615, 617-18 (D. Md. 1991) (noting a reluctance to use Rule 36 procedures as a snare for an "unwary pro se defendant"); see also United States v. Renfrow, 612 F. Supp. 2d 677, 682-83 (E.D.N.C. 2009). See generally McGowan v. Prince George's Cty., 401 F. Supp. 3d 564, 570-

45

71 (D. Md. 2019); <u>Warren v. Cybulski</u>, 556 B.R. 429, 436 (N.D. Cal. 2016); <u>Burger v. Hartley</u>, 896

F. Supp. 2d 1157, 1166 n.7 (S.D. Fla. 2012).

Although in this case Jerry Marsh was pro se at the time the requests were made, he

obtained counsel who was aware of the failure to respond at the latest by February 18, 2020. His

counsel failed to respond to the requests for admission and never moved to seek release from the

admissions even if Jerry Marsh was not aware of the consequences at the time he did not answer

the requests. Federal Rule of Civil Procedure 36(b) provides that "the court may permit withdrawal

or amendment if it would promote the presentation of the merits of the action and if the court is

not persuaded that it would prejudice the requesting party in maintaining or defending the action

on the merits." Pursuant to this rule, courts have granted a motion to withdraw admissions where

counsel learned that there was a failure to respond by the litigant while pro se. <u>See</u> <u>United States</u>

<u>ex rel. Graybar Elec. Co. v. TEAM Constr., LLC</u>, 275 F. Supp. 3d 737, 745-46 (E.D.N.C. 2017);

<u>CFTC v. Int'l Fin. Servs.</u>, 323 F. Supp. 2d 482, 506 (S.D.N.Y. 2004) (granting the motion to

withdraw and allowing proposed answers to be substituted for the default admissions); <u>Simien v.</u>

<u>Chem. Waste Mgmt., Inc.</u>, 30 F. Supp. 2d 939, 941-42 (W.D. La. 1998). Here, counsel for Jerry

Marsh could have made such a motion before or at trial to withdraw or amend the admissions.

Madison would then have had the opportunity to oppose it. But, no motion or anything that could

be construed as a motion was ever made. Further, contrary trial testimony does not constitute a

motion. <u>See</u> <u>AAA Legal Clinic of Jefferson Crooke</u>, 930 F.2d at 1120. As a result, this Court has

no choice but to deem the requested admissions numbers 1-60 and 64 as admitted and adjudged as

findings of fact.[3] These admissions meet the requirement of section 523(a)(2)(A) as shown below.

---

[3] Requests for Admission numbers 62-63 relate to dismissed counts in the Amended
Complaint. Requests for Admission numbers 64 and 65 relate to interest and attorney's fees

### 1. False Representation

- Synico had a contract to supply temporary staff to U.S. Bank. Req. for Admis. 25.

- Syglo did not have a contract to supply temporary staff to U.S. Bank. Req. for Admis. 26.

- Jerry Marsh, in furtherance of his conspiracy with Robert Marsh, falsely represented to Madison that U.S. Bank was Syglo's customer. Req. for Admis. 29.

- Jerry Marsh, in furtherance of his conspiracy with Robert Marsh, falsely represented to Madison that Syglo had a direct contractual relationship with U.S. Bank. Req. for Admis. 31.

### 2. Intent to Deceive/Knowledge of Falsity

- Jerry Marsh, in furtherance of his conspiracy with Robert Marsh, concealed from Madison that Syglo was supplying temporary staff to U.S. Bank as a subvendor to Synico. Req. for Admis. 33.

### 3. Justifiable Reliance

- In reliance on the false representations of fact made by Jerry Marsh to Madison, in furtherance of his conspiracy with Robert Marsh, Madison advanced money to fund payroll expenses for the temporary staff supplied to U.S. Bank. Req. for Admis. 34.

- In reliance on the material omissions of fact made by Jerry Marsh to Madison, done in furtherance of his conspiracy with Robert Marsh, Madison advanced money to fund payroll expenses for the temporary staff supplied to U.S. Bank. Req. for Admis. 35.

---

discussed below. Request 64 relates to the availability of attorney's fees and is admitted, but 65 relating to the date of interest accrued has been modified by Madison in pleadings (Dkt. No. 121).

### 4.  Proximate Cause

- Had Jerry Marsh disclosed to Madison that Syglo was supplying temporary staff to U.S. Bank as a subvendor to Synico, Madison would not have advanced money to fund payroll expenses for the temporary staffing supplied to U.S. Bank. Req. for Admis. 36.

### 5.  Damages/Debt Requirement

- As a direct result of Jerry Marsh's false representation to Madison, done in furtherance of his conspiracy with Robert Marsh, Madison has sustained damages in the amount of $1,676,162.00. Req. for Admis. 37.

- As a direct result of Jerry Marsh's concealment of material facts from Madison, done in furtherance of his conspiracy with Robert Marsh, Madison has sustained damages in the amount of $1,676,162.00. Req. for Admis. 38.

Madison's Request for Admission number 61 requests Jerry Marsh admit the debt is not dischargeable under 11 U.S.C. § 523(a)(2)(A). Federal Rule of Civil Procedure 36(a)(1)(A) provides, "A party may serve on any other party a written request to admit . . . facts, the application of law to fact, or opinions about either." The rule "serves two vital purposes, both of which are designed to reduce trial time. Admissions are sought, first to facilitate proof with respect to issues that cannot be eliminated from the case, and secondly, to narrow the issues by eliminating those that can be." Fed. R. Civ. P. 36(a) advisory committee's note to 1970 amendment. For example, in McSparran v. Hanigan, 225 F. Supp. 628, 630 (E.D. Pa. 1963), the disputed issue was vicarious liability of an employer for the workers compensation statute with an element that the premises were controlled by the employer. In the case, the defendant admitted, "At the time of the accident in suit, the premises on which said accident occurred, were occupied or under the control of defendant." McSparran, 225 F. Supp. at 636. "This admission, involving law as well as fact,

removed one of the issues from the lawsuit and thereby reduced the proof required at trial;" and,

therefore, it is an authorized request for admission under the rule. Fed. R. Civ. P. 36(a) advisory

committee's note to 1970 amendment; see also Wagner v. St. Paul Fire & Marine Ins. Co., 238

F.R.D. 418, 423-24 (N.D.W. Va. 2006) (recognizing a straightforward application of law to fact is

"to admit that if a certain factual situation is found to exist, a certain legal outcome results");

Thompson v. Beasley, 309 F.R.D. 236, 239-51 (N.D. Miss. 2015) ("[F]or a legally-related request

to be deemed admitted . . . , it must connect the relevant legal proposition to specific facts and

circumstances of the case.").

On the other hand, the rule "does not authorize requests for admissions of law unrelated to

the facts of the case." Fed. R. Civ. P. 36(a) advisory committee's note to 1970 amendment; 20

Charles Alan Wright & Mary Kane Kay, Federal Practice and Procedure § 95 (2d ed. 2019)

(recognizing that the scope of Rule 36(a) does not include a "pure matter of law."); see Abbott v.

United States, 177 F.R.D. 92, 93 (N.D.N.Y. 1997).

Further, "[a] party may not request an admission of a legal conclusion under Rule 36 . . . ."

Tobkin v. Fla. Bar (In re Tobkin), 578 F. App'x 962, 964 (11th Cir. 2014); United States v. Petroff-

Kline, 557 F.3d 285, 293 (6th Cir. 2009); Warnecke v. Scott, 79 F. App'x 5, 6 (5th Cir. 2003);

Thompson, 309 F.R.D. at 241; Coach, Inc. v. Horizon Trading USA Inc., 908 F. Supp. 2d 426, 432-

33 (S.D.N.Y. 2012); Stark-Romero v. AMTRAK Co., 275 F.R.D. 551, 554 (D.N.M. 2011).

For example, in Tobkin, 578 F. App'x at 963, the plaintiff brought an adversary proceeding

against a debtor in a bankruptcy pursuant to 11 U.S.C. § 523(a)(7), which excepts from discharge

a debt to the extent it "is a fine, penalty, or forfeiture payable to and for the benefit of a

governmental unit." (quotation omitted). In the case, the plaintiff admitted "that it is not a

'government entity.'" 578 F. App'x at 964. The court held the admission is not authorized under

Rule 36 because it is a legal conclusion. <u>Id.</u>

Here, as in <u>Tobkin</u>, Madison has also brought a non-dischargeability action pursuant to

section 523, but under subsection (a)(2)(A), which excepts from discharge a debt "for money . . .

to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ." For the

Request for Admission number 61, Jerry Marsh admitted that his debt to Madison in the amount

of $1,679,629.00 is a non-dischargeable debt pursuant to section 523(a)(2)(A). Similar to <u>Tobkin</u>,

this admission may be a legal conclusion that is not authorized under Rule 36. On the other hand,

a case can be made that request 61 is the application of fact in this case to law (523(a)(2)(A)) which

is permissible.

Since the other admissions (1-60) are within the scope of the rule as requests to admit facts

or the application of law to fact and meet the elements of section 523(a)(2)(A), the Court need not

decide the issue as to whether number 61 is a legal conclusion. <u>See</u> <u>Hernandez v. Gen. Mills Fed.</u>

<u>Credit Union (In re Hernandez)</u>, 860 F.3d 591, 602 (8th Cir. 2017) ("Whether a requisite element

of a claim under § 523(a)(2)(A) has been satisfied is a factual determination . . . .") (quoting <u>Freier</u>,

604 F.3d at 587); <u>see</u> <u>Fields</u>, 510 B.R. at 233; <u>In re Juve</u>, 761 F.3d at 852.

## IV.     Madison Is Entitled To Its Full Debt And Associated Fees.

Jerry Marsh argued that Madison failed to prove the amount of damages suffered by Jerry

Marsh's misrepresentations. Jerry Marsh argued the correct measure of loss under Minnesota law

is "out-of-pocket" damages and not "benefit-of-the-bargain" damages. Essentially, Jerry Marsh

argued Madison is not entitled to the profits it would have realized under the Master Agreement

and is only entitled to damages for funds actually expended and unrecovered. Jerry Marsh also

argued that Madison cannot recover money advanced after it discovered Jerry Marsh's fraud, citing Clements Auto Co. v. Service Bureau Corp., 444 F.2d 169 (8th Cir. 1971).

### A.  Madison Did Not Advance Funds After It Learned Of The Fraud.

Jerry Marsh, relying on Clements Auto Co., argued that Madison should not be able to recover any money from Jerry Marsh because Madison employees were aware of the facts Madison now allege constituted fraud. However, this Court rejects Jerry Marsh's allegation that Madison employees knew of the subvendor relationship with Synico or that U.S. Bank/Bartech was not Jerry Marsh's direct customer. Nor did Madison know that Syglo routinely took possession of the funds or indirect proceeds before transferring them to Madison. Madison was not aware of the fraud at any point before May 18, 2016, if not until later in May 2016 or early June 2016 when a meeting was held between Madison and Jerry Marsh to discuss the account irregularities. The evidence is that Madison had stopped funding Syglo on the U.S. Bank/Bartech account at that time. Ex. 33.  The only evidence is that no money was advanced after the discovery of fraud in this matter. Therefore, Clements Auto Co. is not applicable.

### B.  Minnesota's "Out Of Pocket" Rule Does Not Apply.

Jerry Marsh also argued that Madison failed to prove the amount it was actually damaged, arguing the amounts depicted on exhibit 33 included profits which Madison should not be entitled to under Minnesota's "out-of-pocket" rule for damages resulting from fraud. Dkt. No. 113. Jerry Marsh's argument ignores the proper interpretation of 11 U.S.C. § 523(a)(2)(A). As discussed above (section II.A), the statute states, "A discharge . . . does not discharge an individual debtor from any debt . . . obtained by . . . false pretenses, a false representation, or actual fraud . . . ." Section 101(12) of the Bankruptcy Code defines the term "debt" as "liability on a claim." The term

"claim" means "a right to payment" as further defined in 11 U.S.C. § 101(5)(A). Madison proved it has a claim for $1,676,162.20. Ex. 33 (see section II.A above).

Although applicable non-bankruptcy law determines the debt (and claim) for purposes of section 523(a)(2)(A), a debt is not limited to fraud as Jerry Marsh essentially argues and includes a claim for breach of contract (in this case, the guaranty). In fact, the term debt in section 523 applies to the entirety of section 523, not just the fraud provisions in subsection (a)(2). Once a debt of any kind has been established, section 523(a)(2)(A) requires proof that this debt was obtained by fraud as discussed above. As the Supreme Court has stated, a debt "is nothing more nor less than an enforceable obligation." Cohen v. De La Cruz, 523 U.S. 213, 218 (1998); see also Reuter, 686 F.3d at 515-16 (finding an uncontested proof of claim meets the requirement of a "debt" for purposes of section 523(a)(2)(A)); Sulier, 541 B.R. at 877 (finding that an undisputed claim listed by the defendant on the schedules is sufficient to find that the defendant owed a debt to the plaintiff and then inquiring whether the scheduled debt was non-dischargeable). Jerry Marsh cites no cases interpreting the term debt in the context of section 523(a)(2)(A) in the manner he suggests.

### C.  Minnesota's "Out Of Pocket" Rule Does Not Limit Damages.

Even if the term "debt" is limited to Minnesota fraud claims, Minnesota law does not support Jerry Marsh's position. The out-of-pocket rule of damages in Minnesota arose and was refined from cases involving fraud and misrepresentations regarding property, as opposed to misrepresentations regarding financing agreements. There are no Minnesota cases on point. See Lewis v. Citizens Agency of Madelia, Inc., 235 N.W.2d 831, 835 (Minn. 1975) ("All the cases applying the rule to date have involved misrepresentations in the sale of goods, the sale of real property, or the procuring of leases."). The rule seeks to compensate a plaintiff for damages that were actual out-of-pocket losses rather than prospective gains, but the Supreme Court of

Minnesota has also stated that a "plaintiff may recover for any injury which is the direct and natural consequence of his acting on the faith of defendant's representations." Id. at 835; see B.F. Goodrich Co. v. Mesabi Tire Co., 430 N.W.2d 180, 182-84 (Minn. 1988). To the extent that the out-of-pocket rule may apply to the damages resulting from Jerry Marsh's fraudulent representations which led to Madison continuing to advance funds on the U.S. Bank/Bartech account, courts have found that earned or future profit may be a consequential damage recoverable for fraudulent representations. Lowrey v. Dingmann, 86 N.W.2d 499, 503 (Minn. 1957); Sports Page, Inc. v. First Union Mgmt., Inc., 438 N.W.2d 428, 433 (Minn. Ct. App. 1989) ("Lost future profits are recoverable when they are established with reasonable certainty."). In this case, there was an agreed upon percentage fee in the Master Agreement which constituted Madison's profit for advanced funds. Once those funds were advanced, Syglo was obligated to pay the percentage fee. Madison's profit on funds advanced, therefore, qualify as a consequential damage under the out-of-pocket rule. Jerry Marsh's arguments that Madison is unable to recoup its profit fail.

In any event, Jerry Marsh seems to believe that because there were a series of loan advances on each payroll, he can offset Madison's profits from the earlier advances that were paid by Syglo against the final debt. He cites no Minnesota case law or statutory support for this theory. The misrepresentations caused the final advances to be unpaid. Minnesota law, even under his interpretation, does not allow a "credit" for profit from previous paid advances or loans to be applied against the final unpaid loan. At most, under his theory, lost profit would have to be backed out of the final $1,676,162.20 claim related to U.S. Bank. That amount would be 10% of the 4% fees (or .4%) of the debt (testimony of Richard Chapman) or $6,704.65.

Even if Jerry Marsh's interpretations of section 523(a)(2)(A) and Minnesota law is correct and the profit from previous paid advances could offset the final unpaid advance or advances, this

Court could simply find the debt is non-dischargeable and leave it for further state court proceedings to establish the amount of the debt. There is no question if all past profit were backed out of the debt, the debt would still be a very high figure based on the bank records in evidence. See Oliver v. Zimmerman (In re Zimmerman), 567 B.R. 521, 529 (Bankr. N.D. Ohio 2017) (declining to enter a money judgment because the prayer for relief in the complaint did not seek the remedy and there was a lack of evidence to liquidate the amount to enter a money judgment); Kidd v. Student Loan Xpress, Inc. (In re Kidd), 472 B.R. 857, 864 (Bankr. N.D. Ga. 2012) (recognizing the relief was not sought); Solis v. Asif (In re Asif), 455 B.R. 768, 798 (Bankr. D. Kan. 2011) (plaintiff failed to prove she was entitled to money judgment); Medlock v. Meahyen (In re Meahyen), 422 B.R. 192, 203 (Bankr. D. Minn. 2010) (abstaining from money judgment despite the plaintiff's request); MBNA Am. Bank, N.A. v. Hostetter (In re Hostetter), 320 B.R. 674, 687 n.11 (Bankr. N.D. Ind. 2005) ("[Plaintiff] is free to pursue collection of its nondischargeable debt in a court other than this one.").

Finally, the admitted requests for admission also establish damages and preclude Jerry Marsh's arguments. Request for Admission number 37 established $1,676,162.00 related to U.S. Bank.

### D.  Debt Related To Other Customers And Interest

Madison also claims a debt owing for other customers. The Court did not receive evidence about the amounts owed for advances made to Syglo's other customers, Cargill, Inc.; Cargill/Ardent Mills; and Contemporary Services Corporation. The Court only received evidence at trial that $1,676,162.20 was proximately caused by Jerry Marsh's false representations regarding U.S. Bank. However, the Request for Admissions numbers 39-52 establish that $3,467.00 is non-

dischargeable for the Cargill/Ardent Mills advances. Since Madison did not pursue this amount at trial, it is unclear if Madison seeks this relatively small additional amount.

Finally, in Madison's proposed findings of fact, Madison indicated that it is entitled to $613,058.70 in prejudgment interest and is also entitled to attorney's fees. Dkt. No. 121. Exhibits 6 (the Master Agreement) and 8 (the Guaranty) clearly allow attorney's fees and interest, as does Request for Admission number 64. Madison indicated that it should be awarded interest at a rate of 10%. Madison indicated that an annual interest rate of 10% of $1,676,162.50, accruing for 1,335 days from June 30, 2016 until February 25, 2020 would result in $613,058.70 in interest. The Court received no testimony during the trial concerning the amount of prejudgment interest to which Madison is entitled or the amount of attorney's fees incurred. The Master Agreement indicates the interest rate on any outstanding obligations "shall be three percent (3.0%) higher than the rate prior to the Event of Default, but in no case less than the Prime rate plus four (4.0%) percent, or such lesser amounts as required by law." Ex. 6 ¶ 17.E.1.iv. The termination letter and demand letter dated June 30, 2016 stated the interest rate referenced in exhibit 6 paragraph 17.E.1.iv. is 7.5%. Ex. 33. Minnesota places the prejudgment interest rate on state court judgments at 10% "[e]xcept as otherwise provided by contract or allowed by law." Minn. Stat. § 549.09(b), (c)(2). Because no argument was made by the parties concerning the correct interest rate in this matter, the contractual rate, the state rate, or a federal rate, and there are conflicting rates disclosed by the record and Madison's proposed findings of fact, the Court will require the parties to submit a proposed calculation of prejudgment interest and authority to support the requested interest rate. Of course, Madison can waive interest and attorney's fees.

The Supreme Court has stated, "Once it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." <u>Cohen</u>, 523

U.S. at 218. Therefore, any attorney's fees, interest, and costs permitted are also non-dischargeable in bankruptcy. Id. at 223. Pursuant to Fed. R. Bankr. P. 7054(b)(2), a request for attorney's fees must be made by motion, but costs may be awarded without a motion pursuant to Fed. R. Bankr. P. 7054(b)(1). The Court will therefore award Madison its costs as the prevailing party, but will decline to consider attorney's fees at this time.

## CONCLUSIONS OF LAW

1. Madison is not entitled to sanctions against Jerry Marsh for spoliation of evidence.

2. Jerry Marsh's debt to Madison in the amount of $1,676,162.20 related to U.S. Bank is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

3. Jerry Marsh's debt of $3,467.00 related to Cargill/Ardent Mills is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

4. Madison's prejudgment interest and costs and attorney's fees are established as non-dischargeable.

## ORDER

For the reasons stated above,

**IT IS HEREBY ORDERED:**

1. The debt owed to Madison Resource Funding Corp. in the amount of $1,676,162.20 plus interest and costs related to U.S. Bank is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and excepted from the discharge in Jerry Marsh's bankruptcy case, No. 16-32074.

2. The debt owed to Madison Resource Funding Corp. in the amount of $3,467.00 plus interest and costs related to Cargill/Ardent Mills is non-dischargeable pursuant

56

to 11 U.S.C. § 523(a)(2)(A) and excepted from the discharge in Jerry Marsh's bankruptcy case, No. 16-32074.

3.       Counts II, III, and IV are dismissed.

4.       Madison shall submit a proposed calculation of prejudgment interest and authority to support its proposed calculations and whether it waives the Cargill amount of $3,467.00 as a non-dischargeable debt by October 7, 2020. Jerry Marsh shall have until October 14, 2020 to file a response on the prejudgment interest issue only.

5.       A hearing, if necessary, on the interest issue will be held on October 15, 2020 at 2:30 PM if the parties have not agreed to collection of prejudgment interest.

Dated:   *September 30, 2020*

/e/ William J. Fisher

_____

William J. Fisher
United States Bankruptcy Judge